**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEBRASKA**

| | |
|---|---|
| GODRON WEIHER, *individually and on behalf of all others similarly situated*, | Case No. |
| Plaintiff, | **CLASS ACTION** |
| v. | **DEMAND FOR JURY TRIAL** |
| COMMUNITY ALLIANCE, INC.; COMMUNITY ALLIANCE REHABILITATION SERVICES; and COMMUNITY ALLIANCE HEALTH PARTNERS, INC., | |
| Defendants. | |

**CLASS ACTION COMPLAINT**

Plaintiff, Gordon Weiher ("Plaintiff"), brings this Class Action Complaint ("Complaint") individually and on behalf of all others similarly situated ("Class Members") against Defendants, Community Alliance, Inc.; Community Alliance Rehabilitation Services; and Community Alliance Health Partners, Inc. (collectively, "Community Alliance"), alleging as follows upon personal knowledge, information and belief, and investigation of counsel.

**NATURE OF THE ACTION**

1. Plaintiff brings this class action against Community Alliance for its failure to properly secure and safeguard Plaintiff's and Class Members' sensitive personally identifiable information ("PII") and personal health information ("PHI"), which, as a result, has been disclosed to cybercriminals and posted on the dark web.

2. In or around April 2024, the notorious criminal ransomware group known as Inc Ransom accessed Community Alliance's network systems and stole Plaintiff's and Class Members' PII and PHI stored therein, including their names, addresses, dates of birth, birth certificates, Social Security numbers, drivers' licenses, taxpayer or other state or federal ID

1

numbers, employer-assigned identification numbers, financial information, medical treatment and diagnosis information, health insurance information, online account credentials, electronic/digital signatures, and other sensitive data (collectively, "Private Information"), causing widespread injuries to Plaintiff and Class Members (the "Data Breach").

3.    According to its website, Community Alliance is an "integrated healthcare organization" providing psychiatric treatment, mental health and substance use counseling, primary medical care, addiction rehabilitation, and related services to patients across the country.[1]

4.    Plaintiff and Class Members are current and former patients of Community Alliance who, in order to obtain services from Community Alliance, were and are required to entrust Community Alliance with their sensitive, non-public Private Information. Community Alliance could not perform its operations or provide the services it does without collecting Plaintiff's and Class Members' Private Information and retains it for many years, at least, even after the patient-provider relationship has ended.

5.    Healthcare and mental health/substance use treatment providers like Community Alliance that handle Private Information owe the individuals to whom it relates a duty to adopt reasonable measures to protect such information from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises under contract, statutory and common law, industry standards, representations made to Plaintiff and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—and especially hackers with nefarious intentions—will harm the affected individuals, including but not limited to by the invasion of their private health matters.

---

[1] *See Who We Are*, Community Alliance, https://community-alliance.org/who-we-are/ (last visited Jan. 20, 2025).

6.    Community Alliance breached these duties owed to Plaintiff and Class Members by failing to safeguard their Private Information that it collected and maintained, including by failing to implement industry standards for data security to protect against cyberattacks, which failures allowed criminal hackers to access and steal thousands of current and former patients' Private Information from Community Alliance's care. According to Community Alliance's reporting to the Department of Health and Human Services, approximately 10,750 individuals' Private Information was wrongfully disclosed in the Data Breach.

7.    According to Community Alliance's public notice of the Data Breach, "On April 8, 2024, Community Alliance became aware of suspicious activity in our computer environment," and subsequently discovered that "between April 2, 2024, and April 8, 2024, an unauthorized actor accessed certain systems and may have accessed certain information in those systems."[2] Community Alliance's ensuing investigation ultimately revealed that the Data Breach affected files containing current and former patients' Private Information.

8.    Plaintiff has since discovered that the notorious Inc Ransom cybergang was behind the Data Breach and as of April 11, 2024, had posted the Private Information accessed therein on its dark web leak site, for any nefarious actor to view, download, and use to commit further crimes against Plaintiff and Class Members, including identity theft and fraud using their compromised and sensitive data.

9.    To make matters worse, although the Data Breach took place on or before April 8, 2024, and the compromised Private Information was posted on Inc Ransom's dark web portal by April 11, 2024, Community Alliance waited *over eight months* before notifying or warning

---

[2] *See* Notice of Data Event, Community Alliance, https://community-alliance.org/notice-of-data-event/ (last visited Jan. 20, 2025).

Plaintiff and Class Members that their Private Information was affected, diminishing their ability to timely and thoroughly mitigate and address harms resulting from the Data Breach.

10.     Community Alliance failed to adequately protect Plaintiff's and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive data. This unencrypted, unredacted Private Information was compromised due to Community Alliance's negligent acts and omissions and its utter failure to protect its patients' sensitive data.

11.     Community Alliance maintained the Private Information in a reckless manner. In particular, Private Information was maintained on and/or accessible from Community Alliance's network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Community Alliance, and thus, Community Alliance knew that failing to take reasonable steps to secure the Private Information left it in a dangerous condition.

12.     The Inc Ransom hackers targeted and obtained Plaintiff's and Class Members' Private Information from Community Alliance's network because of the data's value in exploiting and stealing their identities. As a direct and proximate result of Community Alliances' inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiff's and Class Members' Private Information has been accessed by hackers and exposed to an untold number of unauthorized individuals. The present and continuing risk to Plaintiff and Class Members as victims of the Data Breach will remain for their respective lifetimes.

13.     The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud, and the exposure of an individual's Private Information due to a data breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially

for the rest of his or her life. Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

14.     As a result of the Data Breach, Plaintiff and Class Members, suffered concrete injuries in fact including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress in with dealing with the Data Breach; and (i) the continued risk to their sensitive Private Information, which remains in Community Alliance's possession and subject to further breaches, so long as Community Alliance fails to undertake appropriate and adequate measures to protect the patient data it collects and maintains.

15.     To recover from Community Alliance for these harms, Plaintiff, individually and on behalf of the Class as defined herein, brings claims for negligence/negligence *per se*, breach of implied contract, invasion of privacy, and unjust enrichment to address Community Alliance's inadequate safeguarding of Plaintiff's and Class Members' Private Information in its custody and its failure to provide timely or adequate notice to Plaintiff and Class Members that their information was compromised in the Data Breach.

16.     Plaintiff and Class Members seek compensatory damages, declaratory judgment, and injunctive relief requiring Community Alliance to (a) disclose, expeditiously, the full nature of the Data Breach and the types of Private Information exposed; (b) implement improved data security practices to reasonably guard against future breaches of Private Information in

Community Alliance's possession; and (c) provide, at Community Alliance's own expense, all impacted Data Breach victims with lifetime identity theft protection services.

## PARTIES

### *Plaintiff Gordon Weiher*

17.     Plaintiff is an adult individual who at all relevant times has been a citizen and resident of Douglas County, Nebraska.

18.     At all times material hereto, Plaintiff was a patient of Community Alliance.

19.     As of condition of receiving services from Community Alliance, Plaintiff was required to supply Community Alliance with his Private Information, including but not limited to his name, address, date of birth, Social Security number, driver's license number, health and medical information, and other sensitive data.

20.     Plaintiff greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

21.     Plaintiff would not have provided his Private Information to Community Alliance had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

22.     At the time of the Data Breach—in or around April 2024—Community Alliance retained Plaintiff's Private Information in its network systems, which caused Plaintiff's Private Information to be accessed and exfiltrated by Inc Ransom cybercriminals in the Data Breach.

23.     On or about December 27, 2024, Plaintiff received Community Alliance's Notice Letter informing that unidentified hackers accessed and exfiltrated his Private Information through the Data Breach. According to the Notice Letter, the hackers acquired files containing Plaintiff's

sensitive Private Information, including his full name, date of birth, address, Social Security number, driver's license number, and medical information. Plaintiff has since learned that his Private Information was taken by Inc Ransom and posted for sale on its dark web leak site.

24.    In response to the Data Breach and Notice Letter, Plaintiff has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud. Plaintiff now monitors his financial statements multiple times a week and has already spent many hours dealing with the Data Breach, valuable time he otherwise would have spent on other activities.

25.    Plaintiff further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

26.    The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Community Alliance has still not fully informed him of key details about the Data Breach's occurrence or the information stolen.

27.    Plaintiff further believes his Private Information, and that of Class Members, will be sold and further disseminated on the dark web following the Data Breach as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

28.    The risk of identity theft is not speculative or hypothetical; it is impending and materialized, as Plaintiff's Private Information was targeted and accessed by cybercriminals, and has already been misused by dissemination on the dark web.

29.     Moreover, following the Data Breach, Plaintiff has experienced suspicious spam and believes this be an attempt to secure additional Private Information from him.

30.     Subsequent to the Data Breach, Plaintiff has suffered and will continue to suffer numerous, substantial injuries including, but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of her Private Information; (f) invasion of privacy; and (g) the continued risk to his Private Information, which remains backed up in Community Alliance's possession and subject to further breaches, so long as Community Alliance fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

### Defendants

31.     Defendant Community Alliance, Inc. is incorporated under Nebraska law with its headquarters and principal place of business at 4001 Leavenworth Street Omaha, NE 68105.

32.     Defendant Community Alliance Rehabilitation Services is incorporated under Nebraska law with its headquarters and principal place of business at 4001 Leavenworth Street Omaha, NE 68105.

33.     Defendant Community Alliance Health Partners, Inc. is incorporated under Nebraska law with its headquarters and principal place of business at 4001 Leavenworth Street Omaha, NE 68105.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5 million, exclusive of interest and costs, and the number of Class Members exceeds 100, some of whom have different citizenship from Community Alliance.[3]

35.     This Court has personal jurisdiction because all Defendants are headquartered in Nebraska and engaged in substantial and not isolated activity in this state.

36.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District. Moreover, Community Alliance is based in this District, maintains Plaintiff's and Class Members' Private Information in this District, and has injured Class Members in this District.

## FACTUAL BACKGROUND

**A. Community Alliance Owed Duties to Adopt Reasonable Data Security Measures for Private Information it Collected and Maintained.**

37.     Community Alliance is a healthcare and addiction treatment provider furnishing services related to mental health and substance use treatment and primary healthcare to its patients.

38.     Plaintiff and Class Members are current and former patients of Community Alliance who, as a condition and in exchange for receiving services from Community Alliance, were and are required to entrust Community Alliance with highly sensitive Private Information, including their names, addresses, dates of birth, birth certificates, Social Security numbers, drivers' licenses, taxpayer or other state or federal ID numbers, employer-assigned identification numbers,

---

[3] For example, Community Alliance reported the Data Breach to the Massachusetts Attorney General, evidencing that Massachusetts citizens were victims of the Data Breach. *See* Data Breach Notification Letters December 2024, Mass.gov, https://www.mass.gov/lists/data-breach-notification-letters-december-2024 (last visited Jan. 20, 2025).

financial information, medical treatment and diagnosis information, health insurance information, online account credentials, electronic/digital signatures, and other sensitive data.

39.    In exchange for receiving Plaintiff's and Class Members' Private Information, Community Alliance promised to safeguard the sensitive, confidential data and use it only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

40.    At all relevant times, Community Alliance knew it was storing and using its networks to store and transmit valuable, sensitive Private Information belonging to Plaintiff and Class Members, and that as a result, its systems would be attractive targets for cybercriminals.

41.    Community Alliance also knew that any breach of its information technology network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was compromised, as well as intrusion into those individuals' highly private medical information.

42.    Upon information and belief, Community Alliance made promises and representations to its patients and clients, including Plaintiff and Class Members, that the Private Information collected from them as a condition of obtaining services from Community Alliance would be kept safe and confidential, that the privacy of that information would be maintained, and that Community Alliance would delete any sensitive information after it were no longer required to maintain it.

43.    Indeed, Community Alliance's *Privacy Practices* document, published on its website, affirms that patients have the right to confidentiality of their PHI.[4]

---

[4]    *See Privacy Practices*, Community Alliance, available at https://community-alliance.org/privacy-practices/ (last accessed Jan. 20, 2025).

44.     Community Alliance's *Privacy Practices* further promises that in the event of "a breach of your unsecured medical information[,] [w]e will provide such notification to you without unreasonable delay, but no later than 60 days after we discover the breach."[5]

45.     Community Alliance's *Privacy Practices* further states, "We are required to follow the terms of the Notice currently in effect."[6]

46.     Upon information and belief, Community Alliance posted its *Notice of Privacy Practices* at all physical locations and provided it to all patients receiving services from Community Alliance, including Plaintiff and Class Members.

47.     Plaintiff and Class Members relied on these promises from Community Alliance, a sophisticated business entity and healthcare provider, to implement reasonable practices to keep their sensitive Private Information confidential and securely maintained, to use this information for necessary purposes only and make only authorized disclosures of this information, and to delete Private Information from Community Alliance's systems when no longer necessary for its legitimate business or healthcare purposes.

48.     But for Community Alliance's promises to keep Plaintiff's and Class Members' Private Information secure and confidential, Plaintiff and Class Members would not have sought services from or entrusted their Private Information to Community Alliance. Healthcare patients and consumers, in general, demand security to safeguard their Private Information, especially when Social Security numbers and sensitive medical information is involved.

49.     Based on the foregoing representations and warranties and to obtain services from Community Alliance, Plaintiff and Class Members provided their Private Information to

---

[5] *Id.*

[6] *Id.*

Community Alliance with the reasonable expectation and on the mutual understanding that Community Alliance would comply with its promises and obligations to keep it confidential and protected against unauthorized access.

50.     Plaintiff and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information. To that end, Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

51.     Community Alliance derived economic benefits from collecting Plaintiff's and Class Members' Private Information. Without the required submission of Private Information, Community Alliance could not perform its operations, furnish the services it provides, or receive payment for those services.

52.     Additionally, Community Alliance benefits from Plaintiff's and Class Members' Private Information because it uses the data for fundraising and marketing purposes.

53.     By obtaining, using, and benefitting from Plaintiff's and Class Members' Private Information, Community Alliance assumed legal and equitable duties and knew or should have known that it was responsible for protecting that Private Information from unauthorized access and disclosure.

54.     Community Alliance had and has a duty to adopt reasonable measures to keep Plaintiff's and Class Members' Private Information confidential and protected from involuntary disclosure to third parties, and to audit, monitor, and verify the integrity of its IT networks and those of its vendors and affiliates.

55.     Additionally, Community Alliance had and has obligations created by the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45, HIPAA, 42 C.F.R part 2 ("Part 2"), common law, contract, industry standards, and representations made to Plaintiff and Class Members, to keep

12

their Private Information confidential and protected from unauthorized disclosure. Community Alliance failed to do so.

**B. Community Alliance Failed to Adequately Safeguard Plaintiff's and Class Member's Private Information, causing the Data Breach.**

56.    On or about December 27, 2024, Community Alliance began sending Plaintiff and other Data Breach victims Notice Letters.

57.    The Notice Letters generally inform as follows:

> **What Happened:** On April 8, 2024, Community Alliance became aware of suspicious activity within our community environment. . . . [Community Alliance's] investigation determined that, between April 2, 2024, and April 8, 2024, an unauthorized actor gained access to certain systems and may have accessed certain information contained in those systems. . . .

> **What Information Was Involved:** The investigation determined that your [name; address; date of birth; birth certificate; Social Security number; drivers' license; taxpayer or other state or federal ID number; employer-assigned identification number; financial information; medical information; health insurance information; online account credentials; and electronic/digital signature] were potentially accessible during the event.

58.    Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, or the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

59.    Moreover, despite the Notice Letter's non-committal language (i.e., "potentially accessible during the event"), that Plaintiffs and Class Members were identified by Community Alliance and received this correspondence proves their Private Information was, in fact, compromised in the Data Breach.

60.    Community Alliance also failed to disclose in the Notice Letters that the notorious Inc Ransom hacker group was behind the Data Breach and had posted Plaintiff's and Class Members' compromised Private Information on its dark web leak site.

61.    Thus, Community Alliance's purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiff and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach was and is severely diminished.

62.    Inc Ransom accessed and exfiltrated Plaintiff's and Class  Members' Private Information in the Data Breach and published it to the Rhysida dark web leak page on April 11, 2024 or earlier, where the Private Information has since been exposed to an untold number of bad actors with nefarious intentions.

63.    Upon information and belief, Inc Ransom first breached Community Alliance's network and exfiltrated Plaintiff's and Class Members' Private Information stored in un-encrypted form therein, using common and rudimentary initial access techniques that Community Alliance knew or should have known were necessary to protect against.

64.    Community Alliance could have prevented this Data Breach by properly securing and encrypting the files and file servers containing Plaintiffs' and Class Members' PII, using controls like limitations on personnel with access to sensitive data and requiring multi-factor authentication ("MFA") for access, training its employees on standard cybersecurity practices, and implementing reasonable logging and alerting methods to detect unauthorized access.

65.    For example, if Community Alliance had implemented industry standard logging, monitoring, and alerting systems—basic technical safeguards that any PII-collecting company is expected to employ—then Inc Ransom cybercriminals would not have been able to perpetrate

prolonged malicious activity in Community Alliance's network systems for weeks without alarm bells going off, including the reconnaissance necessary to identify where Community Alliance stored PII, installation of malware or other methods of establishing persistence and creating a path to exfiltrate data, staging data in preparation for exfiltration, and then exfiltrating that data outside of Community Alliance's system without being caught.

66.     Community Alliance would have recognized the malicious activities detailed in the preceding paragraph if it bothered to implement basic monitoring and detection systems, which then would have stopped the Data Breach or greatly reduced its impact.

67.     Community Alliance did not use reasonable security procedures and practices appropriate to the sensitive and confidential nature of Plaintiffs' and Class Members' PII it collected and maintained, such as encrypting files containing PII, requiring MFA for initial access to servers containing PII, or deleting PII from network systems when it is no longer needed, which caused that PII's unauthorized access and exfiltration in the Data Breach.

68.     To mitigate cyber threats from ransomware gangs like Inc Ransom, the Joint Cybersecurity and Infrastructure Security Agency ("CISA") recommends rudimentary actions that businesses like Community Alliance should take: (a) installing updates for operating systems, software, and firmware as soon as they are released; (b) requiring phishing-resistant MFA (i.e., non-SMS text based) for as many services as possible; and (c) training users to recognize and report phishing attempts.[7]

69.     Upon information and belief, Community Alliance failed to require phishing-resistant MFA where possible or adequately train its employees to recognize and report phishing

---

[7]     *#StopRansomware Guide*, CISA (Oct. 2023), available at https://www.cisa.gov/sites/default/files/2023-10/StopRansomware-Guide-508C-v3_1.pdf (last visited Oct. 24, 2024).

attempts. Had Community Alliance required phishing-resistant MFA, and/or trained its employees on reasonable and basic cybersecurity topics like common phishing techniques or indicators of a potentially malicious event, Inc Ransom would not have been able to carry out the Data Breach.

70.     Further, upon information and belief, Community Alliance failed to install updates for operating systems, software, and firmware as soon as they were released. Had Community Alliance installed such updates at its first opportunity as was standard and advised, the Data Breach would not have occurred, or would have at least been mitigated.

71.     As a result of Community Alliance's failures, Plaintiff's and Class Members' Private Information was stolen in the Data Breach when Inc Ransom hackers accessed and acquired files in Community Alliance's computer systems storing that sensitive data in unencrypted form.

72.     Community Alliance's tortious conduct and breach of contractual obligations, as detailed herein, are evidenced by its failure to recognize the Data Breach until cybercriminals had already accessed Plaintiff's and Class Members' Private Information for days, meaning Community Alliance had no effective means in place to detect, prevent, or stop cyberattacks.

73.     As the Data Breach evidences, Community Alliance did not use reasonable security procedures and practices appropriate to the nature of the sensitive Private Information it collected and maintained from Plaintiff and Class Members, such as encrypting the information or deleting it when it is no longer needed. These failures by Community Alliance allowed and caused cybercriminals to target Community Alliance's network and carry out the Data Breach.

74.     Plaintiff's and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Criminal hackers accessed and acquired confidential

files containing Plaintiff's and Class Members' Private Information from Community Alliance's network systems, where they were kept without adequate safeguards and in unencrypted form.

75.     Community Alliance could have prevented this Data Breach by properly securing and encrypting the files and file servers containing Plaintiff's and Class Members' Private Information, but failed to do so.

76.     To make matters worse, Community Alliance waited eight months, until after their Private Information was already published on the dark web, to begin notifying Plaintiffs and Class Members they were affected by the Data Breach. This unreasonable and unexplained delay deprived Plaintiff and Class Members of crucial time to address and mitigate the heightened risk of identity theft and other harms resulting from the Data Breach.

**C. Community Alliance Knew of the Risk of a Cyberattack because Healthcare Providers in Possession of Private Information are Particularly Suspectable.**

77.     Community Alliance's negligence in failing to safeguard Plaintiff's and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

78.     Private Information of the kind accessed in the Data Breach is of great value to hackers and cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the Dark web.

79.     Private Information can also be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information linked to an individual, such as his or her birthdate, birthplace, and mother's maiden name.

80.     Data thieves regularly target entities in the healthcare industry like Community Alliance due to the highly sensitive information that such entities maintain. Community Alliance

knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

81.     Thus, Community Alliance knew or, if acting as a reasonable business and healthcare provider, should have known that the Private Information it collected and maintained would be vulnerable to and targeted by cybercriminals.

82.     According to the Identity Theft Resource Center's report covering the year 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[8]

83.     The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Community Alliance's industry, including Community Alliance itself. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[9]

84.     Community Alliance's data security obligations were particularly important given the substantial increase, preceding the date of the subject Data Breach, in cyberattacks and/or data breaches targeting healthcare entities like Community Alliance that collect and store PHI.

---

[8] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," Jan. 24, 2022, available at https://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data-breach-report-sets-new-record-for-number-of-compromises/ (last accesses Feb. 9, 2024).
[9] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at https://www.ibm.com/reports/data-breach (last accessed Feb. 9, 2024).

85.  For example, of the 1,862 data breaches recorded in 2021, 330 of them, or 17.7%, were in the healthcare industry.[10]

86.  The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[11]

87.  Entities in custody of PHI, like Community Alliance, reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach.[12]  Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[13] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. 40 percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.[14]

88.  Thus, the healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[15]

---

[10] 2021 Data Breach Annual Report (ITRC, Jan. 2022), https://notified.idtheftcenter.org/s/, at 6.
[11] *Id.*
[12] *See* Identity Theft Resource Center, 2022 Annual Data Breach Report, https://www.idtheftcenter.org/publication/2022-data-breach-report/ (last accessed May 8, 2024).
[13] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed May 8, 2024).
[14] *Id.*
[15] https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/.

89.    As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[16]  A complete identity theft kit with health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[17]

90.    As a healthcare entity in possession of its patients' and clients' Private Information, Community Alliance knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. Such consequences include the significant costs imposed on Plaintiff and Class Members due to a breach. Nevertheless, Community Alliance failed to take adequate cybersecurity measures to prevent the Data Breach.

91.    Despite the prevalence of public announcements of data breach and data security compromises, Community Alliance failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

92.    Given the nature of the Data Breach, it was foreseeable that Plaintiff's and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways. Indeed, the cybercriminals who

---

[16] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.
[17] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

possess Plaintiff's and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiff's and Class Members' names.

93.    Community Alliance was, or should have been, fully aware of the unique type and the significant volume of data on its network server(s), amounting to hundreds of thousands of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of that unencrypted data.

94.    Plaintiff and Class Members were the foreseeable and probable victims of Community Alliance's inadequate security practices and procedures. Community Alliance knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

95.    The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiff and Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and the like.

**D. Community Alliance was Required, but Failed to Comply with FTC Rules and Guidance.**

96.    The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

97.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses like Community Alliance. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt

information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[18]

98.    The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[19]

99.    The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

100.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Community Alliance must undertake to meet their data security obligations.

101.    Such FTC enforcement actions include actions against healthcare entities like Community Alliance. *See, e.g., In the Matter of LabMD, Inc*., 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's

---

[18] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016),https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed May 8, 2024).
[19] *Id.*

data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

102.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Community Alliance, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Community Alliance's duty in this regard.

103.    The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[20]

104.    Community Alliance failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

105.    Community Alliance's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

**E.  Community Alliance was Required, But Failed to Comply with HIPAA and Part 2.**

---

[20] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

106.    Community Alliance is a covered business under HIPAA (45 C.F.R. § 160.102) and required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160, Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C.

107.    Community Alliance is further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. *See* 42 U.S.C. §17921; 45 C.F.R. § 160.103.

108.    HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting PHI that is kept or transferred in electronic form.

109.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information."  45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

110.    HIPAA's Security Rule required and requires that Community Alliance do the following:

    a.  Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

    b.  Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

    c.  Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

     d.  Ensure compliance by its workforce.

111.    HIPAA also requires Community Alliance to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information."  45 C.F.R. § 164.306(e). Additionally, Community Alliance is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights."  45 C.F.R. §164.312(a)(1).

112.    HIPAA and HITECH also require procedures to prevent, detect, contain, and correct data security violations and disclosures of PHI that are reasonably anticipated but not permitted by privacy rules. *See* 45 C.F.R. § 164.306(a)(1), (a)(3).

113.    HIPAA further requires a covered entity like Community Alliance to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

114.    HIPAA further requires a covered entity like Community Alliance to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

115.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost

effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[21] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[22]

116.     Additionally, HIPAA's Breach Notification Rule requires that within 60 days of discovering a breach of unsecured patient PHI, as is this Data Breach, Community Alliance must notify each individual affected regarding the nature of the breach, the PHI compromised, steps the individual should take to protect against potential resulting harm, and what Community Alliance is doing to protect against future breaches. 45 C.F.R. § 164.404(b).

117.     As alleged in this Complaint, Community Alliance failed to comply with HIPAA and HITECH. It failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach, and failed to ensure the confidentiality and protection of Plaintiff's and Class Members' Private Information, including PHI.

118.     Community Alliance, as a provider of substance use disorder healthcare services, is further subject to Part 2's rules for protecting against unauthorized disclosure of patient PII obtained in connection with substance use treatment. *See* 42 C.F.R. § 2.16(a).

119.     Part 2 requires Community Alliance to have in place formal policies and procedures to reasonably protect against unauthorized uses and disclosures of PII and to protect against

---

[21] https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last accessed Feb. 13, 2024).
[22] *Id.*

reasonably anticipated threats or hazards to the security of PII, including "[d]estroying such records, including sanitizing the electronic media on which such records are stored, to render the patient identifying information non-retrievable," and "[r]endering the patient identifying information de-identified in accordance with the requirements of 45 CFR 164.514(b) such that there is no reasonable basis to believe that the information can be used to identify a patient." 42 C.F.R. § 2.16(a)(1)(ii).

120.    Part 2 further requires that within 60 days of discovering a breach of unsecured patient PII, as is this Data Breach, Community Alliance must notify each individual affected regarding the nature of the breach, the PII compromised, steps the individual should take to protect against potential resulting harm, and what Community Alliance is doing to protect against future breaches. 42 C.F.R. § 2.16(b); 45 C.F.R. § 164.404(b).

121.    As alleged herein, Community Alliance failed to comply with Part 2, as it failed to destroy or sanitize PII from its network when needed for adequate security, render PII kept on its network non-retrievable, and de-identify PII so it could not be used to identify a patient.

**F. Community Alliance Failed to Comply with Industry Standards.**

122.    A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

123.    The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses,

Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security

Awareness and Skills Training, Service Provider Management, Application Software Security,

Incident Response Management, and Penetration Testing.[23]

124. In addition, the NIST recommends certain practices to safeguard systems,[24] *infra*,

such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

125. Further still, the Cybersecurity & Infrastructure Security Agency makes specific

recommendations to organizations to guard against cybersecurity attacks, including (a) reducing

the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's

network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing]

that software is up to date, prioritizing updates that address known exploited vulnerabilities

---

[23] *See* Rapid7, "CIS Top 18 Critical Security Controls Solutions," available at https://www.rapid7.com/solutions/compliance/critical-controls/ (last acc. Feb. 9, 2024).

[24] Federal Trade Commission, "Understanding The NIST Cybersecurity Framework," https://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist-framework (last acc. Feb. 9, 2024).

identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[25]

126.    Upon information and belief, Community Alliance failed to implement industry-standard cybersecurity measures, including the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiff's and Class Members' Private Information, resulting in the Data Breach.

### G. Community Alliance Owed Plaintiff and Class Members a Common Law Duty to Safeguard their Private Information.

127.    In addition to its obligations under federal and state laws, Community Alliance owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Community

---

[25] Cybersecurity & Infrastructure Security Agency, "Shields Up: Guidance for Organizations," available at https://www.cisa.gov/shields-guidance-organizations (last acc. Feb. 9, 2024).

Alliance's duty owed to Plaintiff and Class Members obligated it to provide reasonable data security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected Plaintiff's and Class Members' Private Information.

128.    Community Alliance owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

129.    Community Alliance owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

130.    Community Alliance owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

131.    Community Alliance owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

132.    Community Alliance owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

133.    Community Alliance failed to take the necessary precautions required to safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized disclosure. Community Alliance's actions and omissions represent a flagrant disregard of Plaintiff's and Class Members' rights.

**H. Plaintiff and Class Members Suffered Common Injuries and Damages due to Community Alliance's conduct.**

134.    Community Alliance's failure to implement or maintain adequate data security measures for Plaintiff's and Class Members' Private Information directly and proximately caused

injuries to Plaintiff and Class Members by the resulting disclosure of their Private Information in the Data Breach.

135. The ramifications of Community Alliance's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

136. Plaintiff and Class Members are also at a continued risk because their Private remains in Community Alliance's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Community Alliance fails to undertake the necessary and appropriate security and training measures to protect its patients' and/or clients' Private Information.

137. As a result of Community Alliance's ineffective and inadequate data security practices, the resulting Data Breach, and the foreseeable consequences of their Private Information ending up in criminals' possession, the risk of identity theft to Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including, without limitation, (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of the benefit of their bargain with Community Alliance; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in Community Alliance's possession and is subject to further unauthorized disclosures so

long as Community Alliance fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

### The Risk of Identity Theft to Plaintiff and Class Members is Present and Ongoing

138.    Plaintiff and Class Members are at a heightened risk of identity theft for years to come because of the Data Breach.

139.    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[26]  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[27]

140.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

141.    The dark web is an unindexed layer of the internet that requires special software or authentication to access.[28]  Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on

---

[26] 17 C.F.R. § 248.201 (2013).
[27] *Id.*
[28] *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[29] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

142.    A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[30] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[31] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[32]

143.    The unencrypted Private Information of Plaintiff and Class Members has already been posted on the dark web, and will end up being further sold and disseminated on the internet black market because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiff and Class Members. Unauthorized individuals can easily access the Plaintiff's and Class Members' Private Information.

---

[29] *Id.*

[30] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[31] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[32] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

144.    Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

145.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

146.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[33]

---

[33] Social Security Administration, *Identity Theft and Your Social Security Number*, available at: https://www.ssa.gov/pubs/EN-05-10064.pdf.

147.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

148.    Even then, new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[34]

149.    Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name. And the Social Security Administration has warned that identity thieves can use an individual's Social Security number to apply for credit lines.[35]

150.    Theft of PHI, in particular, is gravely serious as well: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance

---

[34] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[35] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), https://www.ssa.gov/pubs/EN-05-10064.pdf.

provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[36]

151.    Health information is likely to be used in detrimental ways, including by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[37]

152.    Another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[38]

153.    "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[39]

154.    "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[40]

155.    The reality is that cybercriminals seek nefarious outcomes from a data breach" and "stolen health data can be used to carry out a variety of crimes."[41]

---

[36]    *See*    Federal    Trade    Commission,    Medical    Identity    Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.
[37] *Id.*
[38]https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.
[39] *Id.*
[40]    https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.
[41] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.

156.    One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[42]

157.    With "Fullz" packages, cybercriminals can cross-reference sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble dossiers on individuals.

158.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

159.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

---

[42] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited Feb. 26, 2024).

160.     Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

161.     The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. That is exactly what is happening to Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

162.     Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[43]

163.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[44]

---

[43] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed Jan. 23, 2024).
[44] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.

164.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[45]    Yet, Community Alliance failed to rapidly report to Plaintiff and the Class that their Private Information was stolen.

165.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

166.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

167.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiff and Class Members will need to remain vigilant for years or even decades to come.

### *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

168.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

---

[45] *Id.*

169.    In the event that Plaintiff and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record

170.    Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate that harm.

171.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

172.    These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[46]

173.    Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiff and Class Members will need to maintain these heightened measures for years, possibly their entire lives, as a result of Community Alliance's conduct that caused the Data Breach.

---

[46] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps (last visited Feb. 26, 2024).

### *Diminished Value of Private Information*

174.    Private Information is a valuable property right.[47]    Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

175.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

176.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[48]

177.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells on the dark web for $50 and up.[49]

178.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[50]  In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data

---

[47] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PRIVATE INFORMATION") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PRIVATE INFORMATION, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[48] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/.

[49]    https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

[50] https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

broker who in turn aggregates the information and provides it to marketers or app developers.[51, 52] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[53]

179.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

180.    However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

### *Reasonable and Necessary Future Costs of Credit and Identify Theft Monitoring*

181.    To date, Community Alliance has done little to provide Plaintiff and Class Members with relief for the damages they have suffered as a result of the Data Breach.

182.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, and the fact that entire batches of stolen information have already been published on the dark web, criminals will utilize the Private Information to commit identity theft crimes against Plaintiffs and Class Members—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or lines of credit; or filing false unemployment claims.

---

[51] https://datacoup.com/.
[52] https://digi.me/what-is-digime/.
[53] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

183.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that her or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

184.    Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[54]  The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

185.    Consequently, Plaintiff and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

186.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Community Alliance's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear but for Community Alliance's failure to safeguard their Private Information.

### *Loss of Benefit of the Bargain*

187.    Furthermore, Community Alliance's poor data security deprived Plaintiff and Class Members of the benefit of their bargain.

---

[54] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

188.    When agreeing to provide their Private Information, which was a condition precedent to obtain services from Community Alliance, and paying Community Alliance, directly or indirectly, for its services, Plaintiff and Class Members, as patients and consumers, understood and expected that they were, in part, paying for services and data security to protect the Private Information they were required to provide.

189.    In fact, Community Alliance did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains struck with Community Alliance.

## CLASS ALLEGATIONS

190.    Plaintiff brings this case individually and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the following class:

> All individuals in the United States whose Private Information was compromised in the Data Breach, including all individuals that received a Notice Letter (the "Class").

191.    Excluded from the Class are Community Alliance, its subsidiaries and affiliates, its officers, directors and members of their immediate families, and any entity in which Community Alliance has a controlling interest, the legal representative, heirs, successors, or assigns of any excluded party, the judicial officer(s) to whom this action is assigned, and members of their immediate families.

192.    Plaintiff reserves the right to modify or amend the definition of the proposed Class prior to moving for class certification.

193.    This action has been brought and may properly be maintained as a class action under Federal Rule of Civil Procedure Rule 23 because there is a well-defined community of interest in the litigation, and membership in the proposed classes is easily ascertainable.

194.    **Numerosity:** The Class described above is so numerous that joinder of all individual members in one action would be impracticable. The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. The exact size of the Class and the identities of the individual members thereof are ascertainable through Community Alliances' records, including but not limited to, the files implicated in the Data Breach. According to Community Alliance's self-reporting, the Data Breach impacted 10,750 individuals.

195.    **Commonality:** This action involves questions of law and fact that are common to all Class Members. Such common questions include, but are not limited to the following:

a.  Whether Community Alliance had a duty to protect the Private Information of Plaintiff and Class Members;

b.  Whether Community Alliance failed to implement reasonable data security measures for Plaintiff's and Class Members' Private Information;

c.  Whether Community Alliance breached implied contracts with Plaintiff and Class Members to use reasonable means to protect their Private Information;

d.  Whether Community Alliance was unjustly enriched by failing to implement reasonable or adequate data security measures;

e.  Whether Plaintiff and Class Members are entitled to damages as a result of Community Alliance's wrongful conduct;

f.  Whether Plaintiff and Class Members are entitled to restitution as a result of Community Alliance's wrongful conduct; and

g.  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

196.    **Typicality:** Plaintiff's claims are typical of the claims of the Class Members. The claims of the Plaintiff and members of the Class are based on the same legal theories and arise from the same failure by Community Alliance to safeguard Private Information. Plaintiff and Class Members all provided their Private Information to Community Alliance and had their Private Information accessed, exfiltrated, and compromised in the Data Breach.

197.    **Adequacy of Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex class action litigation, specifically litigation involving data breaches; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, Plaintiff and Plaintiff's will fairly and adequately protect the interests of the Class Members.

198.    **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class Members. For example, Community Alliance's liability and the fact of damages is common to Plaintiff and each member of the Class. If Community Alliance breached its common law and statutory duties to secure Private Information on its network server, then Plaintiff and each Class Member suffered damages from the exposure of sensitive Private Information in the Data Breach.

199.    **Superiority.** Given the relatively low amount recoverable by each Class Member, the expenses of individual litigation are insufficient to support or justify individual suits, making this action superior to individual actions.

200.    **Manageability.** The precise size of the Class is unknown without the disclosure of Community Alliance's records. The claims of Plaintiff and the Class Members are substantially

46

identical as explained above. Certifying the case as a class action will centralize these substantially identical claims in a single proceeding and adjudicating these substantially identical claims at one time is the most manageable litigation method available to Plaintiff and the Classes.

201.    **Ascertainability.** Finally, all members of the proposed Class are readily ascertainable. Community Alliance has access to Class Members' names and addresses affected by the Data Breach. Upon information and belief, Class Members have already been preliminarily identified and sent notice of the Data Breach by Community Alliance.

## CAUSES OF ACTION

### COUNT I: NEGLIGENCE/NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

202.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 201 above as if fully set forth herein.

203.    Community Alliance required Plaintiff and Class Members to submit private, confidential Private Information to Community Alliance as a condition of receiving services from Community Alliance.

204.    Plaintiff and Class Members provided certain Private Information to Community Alliance including their names, addresses, Social Security numbers, dates of birth, medical information, health insurance information, and other sensitive information.

205.    Community Alliance had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiff and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Community Alliance had a duty to Plaintiff and each Class Member to exercise reasonable care in holding, safeguarding, and protecting that Private Information.

206.    Plaintiff and Class Members were the foreseeable victims of any inadequate safety and security practices by Community Alliance.

207.    Plaintiff and the Class Members had no ability to protect their Private Information in Community Alliance's possession.

208.    By collecting and storing Plaintiff's and Class Members' Private Information in its network systems, Community Alliance had a duty of care to use reasonable means to secure and safeguard it, to prevent disclosure of the information, and to safeguard the information from theft. Community Alliance's duty included a responsibility to implement processes by which it could detect if that Private Information was exposed to unauthorized actors and to give prompt notice to those affected in the case of a data breach.

209.    Community Alliance owed a duty of care to Plaintiff and the Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

210.    Community Alliance's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Community Alliance and its patients, which is recognized by laws and regulations including but not limited to the FTC Act, HIPAA, and Part 2, as well as the common law. Community Alliance was able to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from an event like this Data Breach.

211.    Community Alliance's duty also arose from its position as a healthcare provider. Community Alliance holds itself out as a trusted provider of mental health and substance use disorder services, and thereby assumes a duty to reasonably protect its patients' Private

Information. Indeed, Community Alliance, as a healthcare provider, was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members due to the Data Breach.

212.    Community Alliance had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

213.    Pursuant to the FTC Act, 15 U.S.C. § 45, Community Alliance had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

214.    Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq.*, Community Alliance had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

215.    Pursuant to HIPAA, Community Alliance had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304.

216.    Pursuant to Part 2, Community Alliance had a duty to implement formal policies to ensure protection against breaches or unauthorized disclosure of patient PII, including to destroy and sanitizing electronic records with patient PII when appropriate and de-identifying all electronic records containing patient PII on its network systems.

217.    Additionally, pursuant to HIPAA and Part 2, Community Alliance had a duty to provide notice of the Data Breach within 60 days of discovering it. *See* 42 C.F.R. § 2.16(b); 45 C.F.R. § 164.404(b).

218.    Community Alliance breached its duties to Plaintiffs and Class Members under the FTC Act, HIPAA, and Part 2 by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information, by failing to encrypt, de-identify, or timely delete the Private Information from its network systems, and by failing to provide notice to Plaintiff and Class Members of the Data Breach until over a year after Community Alliance discovered it.

219.    The injuries to Plaintiffs and Class Members resulting from the Data Breach were directly and indirectly caused by Community Alliance's violation of the statutes described herein.

220.    Plaintiffs and Class Members are within the class of persons the FTC Act, HIPAA, and Part 2 were intended to protect.

221.    The type of harm that resulted from the Data Breach was the type of harm the FTC Act, HIPAA, and Part 2 were intended to guard against.

222.    Community Alliance's failure to comply with the FTC Act, HIPAA and regulations, and Part 2 constitutes negligence *per se.*

223.    Community Alliance's duty to use reasonable care in protecting Plaintiffs' and Class Members' confidential Private Information in its possession arose not only as a result of the statutes and regulations described above, but also because Community Alliance is bound by industry standards to such Private Information.

224.    Community Alliance breached its duties, and was negligent, by acts of omission or commission, by failing to use reasonable measures to protect Plaintiff's and Class Members'

Private Information. The specific negligent acts and omissions committed by Community Alliance include, but are not limited to, the following:

    a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff's and Class Members' Private Information;

    b. Failing to adequately train employees on proper cybersecurity protocols;

    c. Failing to adequately monitor the security of its networks and systems;

    d. Failing to periodically ensure that its network system had plans in place to maintain reasonable data security safeguards;

    e. Failing to timely notify Plaintiff and Class Members about the Data Breach so they could take appropriate steps to mitigate the risk of identity theft and other damages.

225.    But for Community Alliance's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, their Private Information would not have been compromised and they would not have been injured.

226.    It was foreseeable that Community Alliance's failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyber-attacks and data breaches in the industry.

227.    It was therefore foreseeable that the failure to adequately safeguard Plaintiff's and Class Members' Private Information would result in one or more types of injuries to them.

228.    As a direct and proximate result of Community Alliance's negligence, Plaintiff and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual

consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of the bargain; and (f) the continued and certainly increased risk to their Private Information, which (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains in Community Alliance's possession and subject to further unauthorized disclosures so long as Community Alliance fails to undertake appropriate and adequate measures to protect it.

229.    As a direct and proximate result of Community Alliance's negligence, Plaintiff and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

230.    Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

231.    Plaintiff and Class Members are also entitled to injunctive relief requiring Community Alliance to (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

### COUNT II: BREACH OF IMPLIED CONTRACT
#### (On Behalf of Plaintiff and the Class)

232.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 201 above as if fully set forth herein.

233.    Community Alliance required Plaintiff and Class Members to provide and entrust their Private Information as a condition of obtaining healthcare services from Community Alliance.

234.    When Plaintiff and Class Members provided their Private Information to Community Alliance, they entered into implied contracts with Community Alliance pursuant to

which Community Alliance agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiff and Class Members if and when their Private Information was breached and compromised.

235.    Specifically, Plaintiff and Class Members entered into valid and enforceable implied contracts with Community Alliance when they agreed to provide their Private Information to Community Alliance.

236.    The valid and enforceable implied contracts that Plaintiff and Class Members entered into with Community Alliance included Community Alliance's promise to protect Private Information it collected from Plaintiff and Class Members, or created on its own, from unauthorized disclosures. Plaintiff and Class Members provided this Private Information in reliance on Community Alliance's promise.

237.    Under the implied contracts, Community Alliance promised and was obligated to (a) provide services to Plaintiff and Class Members; and (b) protect Plaintiff's and Class Members' Private Information provided to obtain such services and/or created in connection therewith. In exchange, Plaintiff and Class Members agreed to provide Community Alliance with payment and their Private Information.

238.    Community Alliance promised and warranted to Plaintiff and Class Members, including through its conduct and its *Privacy Practices* set forth *supra*, to maintain the privacy and confidentiality of the Private Information it collected from them and to keep such information safeguarded against unauthorized access and disclosure.

239.    Additionally, Community Alliance promised and warranted to Plaintiff and Class Members, including through its conduct and its *Privacy Practices* set forth *supra*, to notify them within a reasonable time after a breach affecting their Private Information is discovered.

240.    Community Alliance's adequate protection of Plaintiff's and Class Members' Private Information was a material aspect of these implied contracts with Community Alliance.

241.    Community Alliance solicited and invited Plaintiff and Class Members to provide their Private Information as part of Community Alliance's regular business practices. Plaintiff and Class Members accepted Community Alliance's offers and provided their Private Information to Community Alliance.

242.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Community Alliance's data security practices complied with industry standards and relevant laws and regulations, including the FTC Act, HIPAA and regulations, and Part 2.

243.    Plaintiff and Class Members who contracted with Community Alliance for services and provided their Private Information to Community Alliance reasonably believed and expected that Community Alliance would adequately employ adequate data security to protect that Private Information. Community Alliance failed to do so.

244.    A meeting of the minds occurred when Plaintiff and the Class Members agreed to, and did, provide their Private Information to Community Alliance and agreed Community Alliance would receive payment for, amongst other things, the protection of their Private Information.

245.    Plaintiff and Class Members performed their obligations under the contracts when they provided their Private Information and/or payment to Community Alliance.

246.    Community Alliance materially breached its contractual obligations to protect the Private Information it required Plaintiff and Class Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to Community Alliance's inadequate data security.

247.    Community Alliance materially breached its contractual obligations to deal fairly and in good faith with Plaintiff and Class Members when it failed to take adequate precautions to prevent the Data Breach and failed to promptly notify them of the Data Breach.

248.    Community Alliance materially breached the terms of its implied contracts, including, but not limited to by failing to comply with industry standards or the standards of conduct embodied in statutes like Section 5 of the FTC Act, HIPAA, or Part 2; failing to notify Plaintiffs and Class Members within a reasonable time after discovering the Data Breach; and failing to otherwise protect Plaintiff's and Class Members' Private Information, as set forth *supra*.

249.    The Data Breach was a reasonably foreseeable consequence of Community Alliance's conduct, by acts of omission or commission, in breach of these implied contracts with Plaintiff and Class Members.

250.    As a result of Community Alliance's failure to fulfill the data security protections promised in these contracts, Plaintiff and Class Members did not receive the full benefit of their bargains with Community Alliance, and instead services of a diminished value compared to that described in the implied contracts. Plaintiff and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

251.    Had Community Alliance disclosed that its data security was inadequate or that it did not adhere to industry-standard security measures, neither Plaintiff, Class Members, nor any reasonable person would have contracted with Community Alliance.

252.    Plaintiff and Class Members would not have provided and entrusted their Private Information to Community Alliance in the absence of the implied contracts between them and Community Alliance.

253.    Plaintiff and Class Members fully performed their obligations under the implied contracts with Community Alliance.

254.    Community Alliance breached the implied contracts it made with Plaintiff and Class Members by failing to safeguard and protect their Private Information and by failing to provide timely or adequate notice that their Private Information was compromised in and as due to the Data Breach.

255.    As a direct and proximate result of Community Alliance's breach of its implied contracts with Plaintiff and Class Members and the attendant Data Breach, Plaintiff and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Community Alliance.

256.    Plaintiff and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or restitution, in an amount to be proven at trial.

### COUNT III: UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

257.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 201 above as if fully set forth herein.

258.    This count is brought in the alternative to the breach of implied contract count above.

259.    Plaintiff and Class Members conferred a benefit on Community Alliance by way of paying and providing their Private Information to Community Alliance as part of Community Alliance's business as a healthcare provider.

260.    The monies paid to Community Alliance were supposed to be used by Community Alliance, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiff and Class Members.

261.    Community Alliance failed to provide reasonable security, safeguards, and protections to the personal information of Plaintiff and Class Members, and as a result Community Alliance was overpaid.

262.    Under principles of equity and good conscience, Community Alliance should not be permitted to retain the money because it failed to provide adequate safeguards and security measures to protect Plaintiff's and Class Members' personal information that they paid for but did not receive.

263.    Community Alliance wrongfully accepted and retained these benefits to the detriment of Plaintiff and Class Members.

264.    Community Alliance's enrichment at Plaintiff's and Class Members' expense is unjust.

265.    As a result of Community Alliance's wrongful conduct, as alleged above, Plaintiff and the Class are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Community Alliance, plus attorneys' fees, costs, and interest thereon.

### COUNT IV: INVASION OF PRIVACY/INTRUSION UPON SECLUSION
### (On Behalf of Plaintiff and the Class)

266.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 201 above as if fully set forth herein.

267.    Plaintiff and Class Members had a legitimate expectation of privacy to their Private Information and were entitled to Community Alliance's protection of this Private Information in its possession against disclosure to unauthorized third parties.

268.    Community Alliance owed a duty to its patients and clients, including Plaintiff and Class Members, to keep their Private Information confidential and secure.

269.    Community Alliance failed to protect Plaintiff's and Class Members' Private Information and instead, exposed it to unauthorized persons which is now publicly available, including on the dark web, and being fraudulently misused.

270.    Community Alliance allowed unauthorized third parties access to and examination of the Private Information of Plaintiff and Class Members, by way of Community Alliance's failure to protect the Private Information.

271.    The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiff and Class Members is highly offensive to a reasonable person.

272.    The intrusion was into a place or thing, which was private and is entitled to be private—specifically, confidential treatment records related to substance abuse and psychiatric services, some of the most personal data that exists. Plaintiff and Class Members disclosed their Private Information to Community Alliance as a condition of receiving services, but privately with an intention that the Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

273.    The Data Breach constitutes an intentional or reckless interference by Community Alliance with Plaintiff's and Class Members' interests in solitude or seclusion, either as to their persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

274.    Community Alliance acted with a knowing state of mind when it permitted the Data Breach to occur because it had actual knowledge that its information security practices were inadequate and insufficient.

275.    Community Alliance acted with reckless disregard for Plaintiff's and Class Members' privacy when it allowed improper access to its systems containing Plaintiff's and Class Members' Private Information without protecting said data from the unauthorized disclosure, or even encrypting such information.

276.    Community Alliance was aware of the potential of a data breach and failed to adequately safeguard its systems and implement appropriate policies to prevent the unauthorized release of Plaintiff's and Class Members' Private Information.

277.    Because Community Alliance acted with this knowing state of mind, it had notice and knew of the inadequate and insufficient information security practices would cause injury and harm to Plaintiff and Class Members.

278.    As a direct and proximate result of Community Alliance's acts and omissions set forth above, Plaintiff's and Class Members' Private Information was disclosed to third parties without authorization, causing Plaintiff and Class Members to suffer injuries and damages as set forth herein, including, without limitation, (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (d) loss of benefit of the bargain; and (e) the continued and certainly increased risk to their Private Information, which (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains in Community Alliance's possession and is subject to further unauthorized disclosures so long as Community Alliance fails to undertake appropriate and adequate measures to protect the Private Information.

279.    Unless and until enjoined, and restrained by order of this Court, Community Alliance's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and

Class Members in that the Private Information maintained by Community Alliance can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiff and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Gordon Weiher, on behalf of himself and all others similarly situated, prays for judgment as follows:

A.      An Order certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing his counsel to represent the Class;

B.      Awarding Plaintiff and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

C.      Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

D.      Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

E.      Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

F.      Awarding attorneys' fees and costs, as allowed by law,

G.      Awarding prejudgment and post-judgment interest, as provided by law;

H.      Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and,

I.      Any and all such relief to which Plaintiff and the Class are entitled.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: January 21, 2025                      Respectfully submitted,

*s/ Jeff Ostrow*
Jeff Ostrow
**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
Email: ostrow@kolawyers.com

*Counsel for the Plaintiff and Putative Class*